Robert TIDWELL, et al.,
Plaintiffs-Appellees,

v.

Richard SCHWEIKER, etc., et al.,
Defendants-Appellees,

and

Ivan Pavkovic, etc., Defendant-Appellant.

Robert SCHRECKENBERG, et al.,
Plaintiffs-Appellees,

v.

Richard S. SCHWEIKER, etc., et al.,
Defendants-Appellees,

and

Ivan Pavkovic, etc., et al.,
Defendants-Appellants.

Nos. 81–1402, 81–1654.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 8, 1981.

Decided April 30, 1982.

As Amended on Denial of Rehearing and Rehearing En Banc Oct. 4, 1982.

Patricia Rosen, Chicago, Ill., for defendants-appellants.

Fay Clayton, Sachnoff, Schrager, Jones, Weaver & Rubenstein, Chicago, Ill., for plaintiffs-appellees.

Before CUMMINGS, Chief Judge, SWYGERT, Senior Circuit Judge, and CUDAHY, Circuit Judge.

SWYGERT, Senior Circuit Judge.

In 1973 plaintiff-appellee Robert Tidwell, for himself and on behalf of a class similarly situated, filed a complaint against the Director of the Illinois Department of Mental Health ("DMH").[1] An amended complaint was later filed in which Tidwell named the Secretary of the United States Department of Health, Education and Welfare[2] and the Administrator of the Social Security Administration[3] as additional defendants ("federal defendants"). In 1974 plaintiff-appellee Robert Schreckenberg, for himself and on behalf of others similarly situated, filed a suit identical to the Tidwell complaint. The two suits were consolidated pursuant to the state defendant's motion.[4] The plaintiffs challenged the statutory and regulatory scheme providing for the payment of Social Security disability benefits ("Social Security benefits" or "disability benefits") to institutionalized mental patients.

Specifically, plaintiffs alleged that their disability benefits were unlawfully seized by the state and federal defendants in violation of 42 U.S.C. §§ 407 and 1983 and the Fifth and Fourteenth Amendments of the Constitution. The plaintiffs' disability benefits were subject to seizure by one of two methods:

(1) If a patient entering an Illinois institution was determined to be competent, the patient was asked to sign DMH Form 623. The form allowed the state to accumulate disability benefits and other assets in a trust fund. When the assets in the fund reached $400, the state could use the surplus to pay the support costs incurred by the patient at the institution. DMH Form 623 did not disclose to the patient that the patient would be cared for regardless of whether the form was signed, that the agreement was revocable at any time or that the agreement covered Social Security disability benefits, which were not otherwise subject to legal process. *See* Figure I.

(2) If a patient was determined to be incompetent, a representative payee was appointed to receive the patient's disability benefits. The superintendent of the patient's institution was appointed as the

---

1. The DMH is now called the, "Department of Mental Health and Developmental Disabilities." Leroy Levitt, the original defendant in this case, has been replaced by Ivan Pavkovic, the present director.

2. Caspar Weinberger, former Secretary of HEW, has been replaced by Richard Schweiker.

3. John Svahn is presently the Commissioner of the Social Security Administration.

4. The Tidwell and the Schreckenberg plaintiffs will be referred to collectively as "Tidwell." Unless otherwise stated, the state defendants will be referred to as "the State."

payee if there was no other person available, such as a family member, to serve in that capacity. The process for appointing a representative payee did not provide notice to the patient or an opportunity for the patient to submit evidence. Once a representative payee was appointed, the disability benefits were accumulated in a trust fund identical to that used in conjunction with Form 623. *See* Figure I.

FIGURE I

Path of S.S. Benefits

A three-judge court was impaneled to consider the issues raised by this suit. On June 23, 1976 the court found that the Illinois statutory and regulatory scheme involving the use of DMH Form 623 was in conflict with 42 U.S.C. § 407 and, therefore, violated the supremacy clause of the Constitution. The three-judge court also found that the appointment of an Illinois institutional superintendent as a representative payee was not *per se* unlawful, but that the procedures actually used to appoint such a payee violated due process standards. The court ordered specific remedial steps to cure both violations.

Subsequent to this ruling, both the State and the federal defendants altered their procedures relating to patients' disability benefits. On March 5, 1979 the three-judge court amended its 1976 order and determined that the revised federal procedures for appointing a representative payee now comported with due process. The court also found that revised DMH Form 623 was no longer an assignment in violation of 42 U.S.C. § 407. Additionally, Tidwell's motion for class certification was granted.

After this decision, plaintiffs' attorneys filed motions in the Northern District of Illinois pursuant to 42 U.S.C. § 1988 requesting attorney's fees against both the State and federal defendants. The court concluded that fees could not be awarded against the federal defendants and Tidwell voluntarily reduced fees attributable solely to these defendants. On February 6, 1981, the district court held that the State was responsible for all remaining attorney's fees and applied a 1.5 lodestar multiplier to the hourly rates of all attorneys and paralegals.

The State now appeals from the final judgment of the court on four grounds:

(1) Tidwell did not have standing to challenge the legality of DMH Form 623;

(2) the original Form 623 was not an assignment in violation of 42 U.S.C. § 407;

(3) the district court erred in awarding attorney's fees; and,

(4) the district court erred in failing to apportion attorney's fees between the state and federal defendants and by applying a lodestar multiplier.

Tidwell contends that all the issues raised on appeal by the State are moot except whether the award of attorney's fees was proper. We shall first consider the mootness issue.

I

Tidwell argues that the underlying controversy in this case has been extinguished and further review by this court would be meaningless. Tidwell bases this argument on the fact that the State defendant voluntarily altered DMH Form 623 and the new form has been in effect for more than five years; the challenged activity has ceased and there is no reasonable expectation that the conduct will be repeated.

■ The record does not show that the State's actions were "voluntary." The DMH altered Form 623 only after the three-judge court declared it illegal and this conduct was in compliance with the judgment of the court. If a party believes an order is incorrect, the remedy is to comply promptly with that order or judgment (absent a stay) and then to appeal. *Maness v. Meyers*, 419 U.S. 449, 458–59, 95 S.Ct. 584, 590, 42 L.Ed.2d 574 (1975). A party does not lose the right to appeal simply because it complies with an order of the court. Further, in the instant case, there is reason to believe that the conduct complained of may be repeated. In its reply brief, the State reaffirmed its belief that the original Form 623 was legal and, stated that if allowed to do so, it would reinstitute the form's use. Where a reasonable expectation exists that the conduct will be repeated, the issue is not moot. *Johnson v. Board of Education*, 664 F.2d 1069, 1071–72 (7th Cir. 1981). Because we have concluded that none of the issues raised in the State's appeal are moot, we now turn to the merits of those arguments.

## II

The State contends that Tidwell lacks standing to challenge Form 623 because neither he nor any of the other named plaintiffs signed the form or were even asked to sign it. The record in this case, however, discloses that when a patient was admitted to a DMH facility an inquiry was made to determine whether that patient was competent or incompetent. At this point, as the district court expressly found, every patient was threatened by the Form 623 procedures. In addition, whether a patient eventually signed the form (if found competent) or had a representative payee appointed (if found incompetent), the entire system resulted in the deprivation of the

Social Security benefits of every patient. These undisputed facts, delineated in greater length earlier in this opinion, establish that the plaintiffs in this action, named and unnamed alike, were subject to but a single system which caused all of them the same injury.[5] Standing to challenge this system, in which the State was a knowing and active participant, is not defeated simply because the named plaintiffs did not actually sign Form 623. Every plaintiff was threatened by Form 623 upon entering the facility, every plaintiff was subject to the same system of deprivation, and in the end, every plaintiff suffered the identical harm—deprivation of Social Security benefits. Only the precise means by which the injury was inflicted were different.

The recent Supreme Court case of *Blum v. Yaretsky*, —— U.S. ——, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), which discusses standing, does not compel a different result. In that case, Medicaid patients in a nursing home brought an action on behalf of themselves and other members of a class to challenge nursing home procedures which allowed the transfer or discharge of such patients without notice or hearing. The named plaintiffs had been transferred to lower levels of care, but they sought to represent other class members who allegedly had been transferred to a higher level of care. The Court held that they lacked standing to challenge transfers to higher levels of care. The Court found that "[n]othing in the record available to this Court suggests that any of the individual respondents have been either transferred to more intensive care or threatened with such transfers." *Id.* at ——, 102 S.Ct. at 2784. The plaintiffs contended that the standing requirements of Article III were nevertheless met because other unnamed class members had been transferred to higher levels of care under the contested procedure, but the Court rejected this contention:

---

5. *See* Part IV, *infra*, for a discussion of the State's role and culpability in both prongs of the system of deprivation.

Respondents . . . "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Warth v. Seldin*, 422 U.S. 490, 502, 95 S.Ct. 2197, 2207, 45 L.Ed.2d 343 (1975). Unless these individuals "can thus demonstrate the requisite case or controversy between themselves *personally* and [defendants], 'none may seek relief on behalf of himself or any other member of the class.' *O'Shea v. Littleton*, 414 U.S. 488, 494 [94 S.Ct. 669, 675, 38 L.Ed.2d 674] (1974)."

*Id.* at n.13, 102 S.Ct. at 2784 n.13 (emphasis added). The Court then emphasized that a transfer to a lower level of care was very different from a transfer to a higher level, noting that first, patients may refuse transfer to a higher but not lower level of care without jeopardizing Medicaid benefits, and second, transfer to a lower level necessarily results in a reduction in Medicaid benefits while transfer to a higher level means an increase in those benefits.

■ In the instant case, unlike *Blum*, the injury suffered by all of the class members was the same—deprivation of Social Security benefits. Further, as the district court found, all of the class members upon entering a DMH facility were threatened with the same system of deprivation, which included Form 623. Therefore, applying the analysis of *Blum* to the facts in the case at bar, we conclude that the named plaintiffs have standing under Article III to challenge both Form 623 and the representative payee procedure.

■ The State also challenges the district court's determination that the claims of the named plaintiffs were typical of the claims of all members of the class. We conclude that the district court properly found that the requirements of Rule 23

were met in this case. We believe that it was unnecessary for the named plaintiffs actually to have signed Form 623 to be proper representatives for the entire class.

In *General Telephone Co. v. Falcon*, —— U.S. ——, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), the plaintiff as an individual and as a class representative sought to challenge alleged discrimination by the defendant in both hiring and promotion. The Court concluded that the named plaintiff, whose claim charged the defendant with discrimination in promotion, could not under Rule 23 represent other class members who had not been hired. As the Court found, not being hired and not being promoted are quite different injuries. In addition, the Court recognized that there could easily be a tension, especially at the remedial stage, between those class members seeking promotion and those seeking initial employment. In the case at bar, however, there is no such tension since every patient suffered the identical injury (deprivation of Social Security benefits) via a single system of deprivation.

The named plaintiff in a class action must have standing under Article III and be a proper class representative under Rule 23. For the reasons stated, we conclude that *Tidwell* satisfied the requirements for both.

### III

■ We agree with the three-judge court that the original DMH Form 623 violated 42 U.S.C. § 407. Section 407 provides:

The right of any person to any future payment under this subchapter shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other

legal process, or to the operation of any bankruptcy or insolvency law.

The Supreme Court has issued one opinion to date on the scope and purpose of section 407: *Philpott v. Essex County Welfare Board*, 409 U.S. 413, 93 S.Ct. 590, 34 L.Ed.2d 608 (1973). Though not directly analogous to the facts of this case, *Philpott* is instructive. In *Philpott* an individual named "Wilkes" applied for assistance from the Essex County, New Jersey, Welfare Board. As a condition for receiving the assistance, the Board required Wilkes to execute a reimbursement agreement. The agreement had the effect of a judgment and allowed the Board to obtain reimbursement out of subsequently discovered or acquired property. Wilkes began receiving assistance from the Board, and soon after he was awarded lump-sum retroactive disability benefits under the Social Security Act. Wilkes declined to repay his interim assistance and the Board sued to reach the bank account in which Wilkes had deposited his benefit check. The Supreme Court held that section 407 on its face prevented the Board from reaching these funds. The Court concluded that the language of section 407 is all inclusive and it "imposes a broad bar against the use of any legal process to reach all Social Security benefits." *Id.* at 417, 93 S.Ct. at 592.

Despite the breadth of *Philpott*, the State insists that Form 623 was not an assignment; it was revocable and voluntary, the funds were used for the purpose they were granted for, and the agreement did not manifest a present intent on the part of the mental patient to transfer all his rights or complete control. We are not persuaded by these arguments.[6]

Even though Form 623 was revocable, it still remained a transfer or assignment while it was in effect. Further, we are not convinced that it was voluntary. Nowhere on the face of the form did it state that a patient would be treated regardless of whether he signed the form or that the agreement was revocable. The restrictive definition of assignment based on Illinois law advanced by the State ignores the language and the purpose of section 407. An agreement need not have permanence or transfer complete control of disability benefits before it falls within the ambit of section 407.

The State cites three cases which it believes require a reversal of the three-judge court.[7] In these three cases, *Moore, French*, and *Tunnicliffe*, the facts are similar. Applicants for Social Security benefits were granted interim assistance by a local welfare department. There was generally a six-month delay between the date the federal benefits were applied for and the date they were received. The first federal payment included a lump-sum payment for benefits retroactive to the application date. The local department required the recipient to sign a loan agreement and an authorization to pay a claim. When the recipient received his Social Security benefits, including his lump-sum retroactive payment, he became obligated to pay back the interim assistance to the local agency. The agreements in all three cases were held valid even though a recipient was required to sign the agreement before receiving interim assistance and even though the agreements did not disclose a person's rights under *Philpott* or section 407.

---

**6.** *Philpott* forecloses the State's argument that section 407 does not apply when the benefits are used for the purpose for which they were granted.

**7.** *Moore v. Colautti*, 483 F.Supp. 357 (E.D.Pa. 1979), *aff'd*, 633 F.2d 210 (3d Cir. 1980);

*French v. Director, Michigan Dept. of Social Services*, 92 Mich.App. 701, 285 N.W.2d 427 (1979); *Tunnicliffe v. Commonwealth of Pennsylvania Dept. of Public Welfare*, 483 Pa. 275, 396 A.2d 1168 (1978).

*Moore, French*, and *Tunnicliffe* are distinguishable from the facts in the instant case and we do not believe they support the State's position. The agreements were nothing more than an obligation to pay back a loan and they did not delineate the source of the repayment. The agreements did not subject Social Security benefits to any legal process nor did they transfer control of Social Security benefits to the State. Most importantly, unlike Form 623, these agreements did not result in monthly Social Security checks actually being received and disbursed by the state agency.[8] If a recipient from *Moore, French*, or *Tunnicliffe* chose not to repay the local agency, the Social Security funds could not be reached. In the instant case, the recipients had no choice of whether to pay the State for the service they received; the state received and cashed their checks. Further, the DMH was obligated to pay its own expenses first when a trust was created pursuant to Form 623, putting the State in the position of a preferred creditor; a position found illegal by the Supreme Court in *Philpott.*

We are convinced that Form 623 is a transfer or an assignment in violation of section 407. Unless a patient in a DMH institution is advised that he will receive treatment regardless of whether he signs Form 623, that Form 623 is revocable, and that the form covers Social Security benefits not subject to legal process, it cannot be said that Form 623 is voluntary or that the patient retains enough control to remove the agreement from the ambit of section 407.

## IV

42 U.S.C. § 1988 gives courts the discretion to award attorney's fees to the prevailing party in civil rights suits. It is clear that Tidwell has prevailed in this litigation. The plaintiffs succeeded on two of their three substantive claims[9] and were instrumental in prompting substantial changes in the procedures for disbursement of disability benefits to mental patients. This broad remedial relief inured to the benefit of all mental patients in Illinois because plaintiffs also succeeded in their motion for class status. For Tidwell to be considered the prevailing party, it was not necessary that he prevail on all three claims. *See Dawson v. Pastrick*, 600 F.2d 70, 78 (7th Cir. 1979); *Parham v. Southwestern Bell Telephone Co.*, 433 F.2d 421 (8th Cir. 1970). The record does not disclose any special circumstances which would render the award of fees unjust. *See Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968).

## V

The only remaining issue is whether the amount of the fees awarded was erroneous. The State contends that the award was excessive for several reasons:

(1) The State was held responsible for fees relating to issues involving only the federal defendant;

---

**8.** In *Moore, supra*, n.12, some of the lump sum Social Security checks were actually received by the state agency, not the recipient of the Social Security benefits. The agency paid itself the money owed by the recipient and then paid the remainder to the recipient. The checks were paid directly to the state agency in accordance with the Interim Assistance Reimbursement Program, 42 U.S.C. § 1383(g)(1).

Direct payments to state agencies under section 1383(g)(1) do not violate section 407.

**9.** The only claim Tidwell did not prevail on was the claim that the appointment of a representative payee was a *per se* violation of the Constitution.

(2) the fees awarded to the Cook County Legal Assistance Foundation ("CCLAF") are duplicative; and

(3) the use of a 1.5 lodestar multiplier was erroneous.

We reject the State's first two arguments but agree with its third contention.

■■■■■ The State insists that the illegal appointment of a representative payee involved only federal culpability and the State of Illinois should not be held liable for attorney's fees relating solely to this issue. The State's assertion of innocence is directly controverted by the findings of the district court. The court found that a conspiracy existed between the state and federal defendants.[10] To prove the existence of a civil conspiracy, it is not necessary to show an express agreement. All that is required is that the participants share a "general conspiratorial objective." *Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir. 1979). In the instant case, the illegal diversion of Social Security benefits from the plaintiffs to the state defendant was the common conspiratorial objective.

Relying on *Arnold v. IBM*, 637 F.2d 1350 (9th Cir. 1981), the State next argues that the conduct of the DMH was not the proximate cause of Tidwell's injuries: the appointment of a representative payee is not illegal *per se* and the only illegal aspect of the procedure was solely within the control of the federal defendants.[11] Not only is *Arnold* factually distinguishable from the instant case,[12] it was not necessary for the state defendant to have had control over the illegal procedures when the DMH willingly participated in and benefited from the procedures. *Arnold* requires only that the defendant "personally participated in a deprivation of the plaintiff's rights." 637 F.2d at 1355. The DMH's participation in a conspiracy is clearly established by the record. The appointment of a DMH superintendent as a representative payee was usually initiated by the state institution. The institution was required to fill out a five-page application and submit evidence indicating that the institution was responsible for the patient's care. Each time a DMH institution superintendent applied to become a representative payee, the DMH set in motion a series of acts where the reasonable outcome was a constitutional injury. *See Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). The representative payee procedures involved both federal and state liability and it was well within the district court's discretion to assess attorney fees against the state on this important issue.

■■■■ In arguing that the attorney's fees awarded to CCLAF are duplicative, the

---

**10.** The State argues that a finding of conspiracy was never made by the three-judge court. A single district court judge first identified the existence of a conspiracy in his order awarding attorney's fees. It was not necessary for the three-judge court to have made the finding of conspiracy. This case was disposed of by the three-judge panel on summary judgment and no findings of fact are required by Fed.R.Civ.P. 56.

**11.** The State of Illinois did have some control over the appointment of a representative payee. This is demonstrated by the fact that the State amended Ill.Rev.Stat. ch. 91½ § 2–105 (1979) to require informed consent before a service provider (DMH superintendent) can be appointed a representative payee.

**12.** In *Arnold v. IBM, supra*, the Ninth Circuit held that no causation was proven where IBM created a task force which violated plaintiff's constitutional rights. Although IBM was the "but for" cause of plaintiff's injuries, the court found that IBM did not have sufficient control over the task force to be held responsible for its actions. The instant case is distinguishable because the DMH set in motion a series of acts when the DMH knew or should have known that a constitutional injury was the only reasonable outcome. In *Arnold* a constitutional violation was not a reasonable outcome of establishing the task force.

State maintains that both sets of attorneys billed for briefs on the same issue and both sets of attorneys billed for the same court appearance. The State, however, has overlooked the procedural posture of this case. As stated above, this suit involved two sets of plaintiffs: the Tidwell plaintiffs and the Schreckenberg plaintiffs. In accordance with a stipulation, an attorney for the Tidwell plaintiffs was designated lead counsel for the consolidated cases. Almost all the hours billed by CCLAF were for work done prior to the certification of the class; the two groups of plaintiffs were still separate and distinct up to this point. The only work performed by CCLAF after the class certification related to the petition for attorney's fees.[13] We do not believe that the district court overlooked any duplication of efforts.

■ Having examined all of the factors for determining the appropriateness of a fee award as outlined in *Waters v. Wisconsin Steel Workers of International Harvester Co.*, 502 F.2d 1309 (7th Cir. 1974), *cert. denied*, 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823, we believe that it was an abuse of discretion to attach a 1.5 multiplier to the attorney's fees awarded in this case. The district court premised the multiplier on the importance of the results achieved by Tidwell's attorneys. We agree with the district court that the results achieved are important, but we do not think that this factor alone justifies the use of the multiplier.[14] The quality of the attorney's services was reflected in the hourly rates and the facts of this case are relatively simple. This suit was indeed novel when filed but not so different or unique as to warrant a multiplier. The other factors outlined in *Waters* were not important enough to be mentioned by the district court and we agree that these factors were insignificant.

■ The district court's order is affirmed in part and reversed in part. The cause is remanded to that court to recompute the attorney's fees in accordance with this opinion.[15]

13. The State points out that CCLAF billed for an appearance not corroborated by the docket. In plaintiffs' motion for attorney's fees, reference was erroneously made to a court appearance on January 8, 1980. The correct date was December 27, 1979. This typographical error is no reason to deny or limit the award of fees and the error would have been corrected in the district court if defendants had raised the issue below.

14. It is possible that results alone might justify a multiplier but this is not the case here.

15. The only aspect of the fee award that the State agrees with is the denial of fees to appellant M. Daniel Friedland. The district court held that it would be unjust to tax the State of Illinois for Friedland's fees because Friedland represented an Indiana plaintiff and his case was directed at Indiana officials. Friedland may well have had some connection with the attorneys for the Illinois plaintiffs, but we cannot say the court abused its discretion by denying fees to him.